UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JANET MCGHEE, | } |
| Plaintiff, | } |
| vs. | } CASE NO. CV 02-B-0920-S |
| UNIVERSITY OF ALABAMA HEALTH SERVICES FOUNDATION, | } |
| Defendant. | } |

ENTERED
AUG 1 2 2004

## MEMORANDUM OPINION[1]

Currently before the court is a Motion for Summary Judgment filed by the defendant, University of Alabama Health Services Foundation, P.C. ("defendant" or "Foundation"). In her complaint, plaintiff Janet McGhee ("plaintiff"), an African-American, alleges defendant discriminated against her based upon her race when she was terminated. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted.

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). This is an important opinion. Before requesting a proposed opinion from defendant's counsel, the court had reached a firm decision as to the appropriate outcome. Counsel drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. Although largely taken from the opinion proposed by defendant's counsel, the opinion reflects the court's own conclusions.

1

## I. FACTUAL SUMMARY

Defendant hired plaintiff as a Patient Escort on October 13, 1999. (Doc. 17, Tab 1 at 12-13.) James Harper, an African-American, was plaintiff's immediate supervisor. (*Id.* at 54.) In July 2001, plaintiff injured her ankle and missed work for a period of time. (*Id.* at 73-76; Doc. 21 ¶¶ 3-4.) Upon returning to work, plaintiff worked in a light duty capacity, assigned to the valet parking deck. (Doc. 17, Tab 1 at 76; Doc. 21 ¶ 4.) Jesse Scott, an African-American, was the supervisor over the valet parking area. (Doc. 17, Tab 1 at 77, 85; Tab 5 at 18-20; Doc. 21 ¶ 4.) Plaintiff retained her light duty parking deck assignment until her termination. (Doc. 17, Tab 1 at 76.)

### A. The September 25, 2001 Incident

On September 25, 2001, a security guard, Belinda Robinson, an African-American, reported an incident to her supervisor Patrick Rhodes, (white), Director of Security. (Doc. 17, Tab 4 at 7-8, 10-11, 17-18, 31-32 and Ex. 1; Tab 2 at 40.) According to Robinson, an incident had just occurred involving plaintiff possibly distributing prescription medication to a white co-worker, Robbie McCarty. (Doc. 17, Tab 4 at 10-11, 19, 31-32 and Ex. 1.) Robinson told Rhodes that she was walking with another employee, Yavis Dozier, an African-American, in the valet parking area that morning when plaintiff asked Dozier to come over and speak. (*Id.* at 11-12, 31-32 and Ex. 1.) Dozier later told Robinson that plaintiff wanted to see McCarty because plaintiff had some drugs to sell him.[2] (*Id.* at 12, 31-32 and Ex. 1.)

---

[2] In her deposition, Dozier stated that she stopped and talked to Robinson while on her way to the snack bar. (Doc. 17, Tab 3 at 10-11.) While they were talking, Dozier said McCarty approached her and asked if she had seen plaintiff and Dozier said she had not. (*Id.* at 11.) When Dozier returned to Robinson, according to Dozier's deposition testimony, Robinson told her "they say that Robbie [McCarty] have (sic) been looking around for [plaintiff] everywhere because he's buying drugs from [plaintiff]." (*Id.*) Dozier replied, "everybody heard about that." (*Id.*)

2

After speaking to Dozier, Robinson went into the security control room where she and security guard Rosa Young, an African-American, watched the valet parking area on the security monitor. (Doc. 17, Tab 4 at 44-45; Tab 7 ¶ 3; *see also* Tab 2 at 11-12.) Robinson turned on the video recorder attached to the monitor to record the valet parking area. (Doc. 17, Tab 4 at 31-32 and Ex. 1.) They observed plaintiff grabbing her purse and conducting a "transaction" with McCarty. (*Id.*) McCarty then walked to the cashier's desk, returned to where plaintiff was sitting, and engaged in "another transaction" with plaintiff. (*Id.*) Robinson prepared an incident report of what she and Young observed and provided it to Rhodes. (*Id.* at 18, 31-32 and Ex. 1.)

Rhodes reported the incident to his supervisor, David Williams.[3] (*Id.* at 8, 11.) Williams told Rhodes to speak with Jeannie Thomas, Manager of Employee Relations, to determine how the situation should be handled. (*Id.* at 11; Tab 5 at 7; Tab 2 at 39.) Thomas instructed Rhodes to work with Steve Brannan,[4] Corporate Compliance Officer, and to conduct an investigation. (Doc. 17, Tab 4 at 15-16; Tab 2 at 7, 11-12, 39.)

### B.   The Investigation

The investigation consisted of Brannan and Rhodes interviewing plaintiff and McCarty (Doc. 17, Tab 6 ¶ 3 and Ex. A.), interviewing individuals who were identified as possibly having knowledge of the situation, and following up on information obtained during the investigation (Doc. 17, Tab 2 at 23-24, 33-40 and Ex. 1; Tab 4 at 21-28, 41-43). Prior to conducting the interviews, Brannan and Rhodes attempted to review the videotape on which Robinson recorded the images from the security monitor. (Doc. 17, Tab 2 at 17, 48-49.) However, the quality of the

---

[3] Rhodes, Robinson and Young were all employees of U.S. Security. (Doc. 17, Tab 4 at 8, 11, 44 and Ex. 1.) Williams was employed by The Health Services Foundation. (*Id.* at 8.) At that time, The Foundation contracted out security services through U.S. Security. (*Id.*)

[4] Steve Brannan is white.

tape was so poor that it did not capture any images on tape. (*Id.* at 48-49; Tab 4 at 30-31.) During plaintiff's interview, Brannan and Rhodes showed her the security camera video tape, but they did not view the contents of the tape. (Doc. 17, Tab 2 at 15-16.)

### 1. Interview with McCarty

Brannan and Rhodes interviewed McCarty around 8:00 a.m. on September 27, 2001. (Doc. 17, Tab 2 at 22, 25 and Ex. 1; Tab 6 ¶ 3 and Ex. A.) They informed him that he had been observed engaging in a transaction with plaintiff. (Doc. 17, Tab 2 at 22, 25 and Ex. 1.) McCarty explained that he had a lot of pain in his legs and back and asked plaintiff if she had any Tylenol. (*Id.*) According to McCarty, plaintiff told him that she had something better and gave him two Lortab pills from a bottle in her purse. (*Id.* at 22, 25-26 and Ex. 1; Tab 4 at 19-20.) He denied that plaintiff sold him the prescription pain killers. (Doc. 17, Tab 2 at 25.) Brannan and Rhodes also questioned McCarty about whether he had received pills from any other employee. (*Id.* at 22, 38-39 and Ex. 1.) Although McCarty did not deny that he had received pills from any other employee, he would not provide any additional information. (*Id.* at 22, 38-39 and Ex. 1.) During the interview, McCarty said he wanted to resign his employment. (*Id.* at 27-28; Tab 4 at 42-43.) He later submitted a typed resignation to defendant and resigned effective September 27, 2001. (Doc. 17, Tab 7 ¶ 4 and Ex. A.)

### 2. Interview with Plaintiff

James Harper, plaintiff's supervisor, escorted plaintiff to the administration building around 10:30 a.m. (Doc. 17, Tab 1 at 87-90.) Brannan and Rhodes asked plaintiff about the allegation that plaintiff had given or sold prescription medication to McCarty. (*Id.* at 90; Tab 2 at 14.) Plaintiff claims they also showed her the videotape sitting on the table and told her they

4

had caught the incident on tape.[5] (Doc. 17, Tab 1 at 90.) She denied the allegations and told them to call UAB police. (Doc. 17, Tab 1 at 90; Doc. 21 ¶ 15.)

Plaintiff then told Brannan and Rhodes that she had not sold McCarty any prescription medication. (Doc. 17, Tab 1 at 90-91.) In her deposition, plaintiff recounted an incident occurring on the morning in question, in which McCarty had picked up a prescription for her and she had reimbursed him for it. (*Id.* at 78-81; Doc. 21 ¶ 9.) According to plaintiff, she dropped off a prescription for anti-inflammatory medication at the Kirklin Clinic pharmacy. (Doc. 17, Tab 1 at 78-79.) She claims McCarty picked up the filled prescription (without her permission) that same day. (*Id.* at 77-81.) Plaintiff also stated that McCarty came to the valet parking area on September 27, 2001, around 8:30 or 9:00 a.m., gave her the prescription, and said she owed him thirteen dollars for the medicine. (*Id.* at 77, 80, 86, 94; Doc. 21 ¶ 10.) Plaintiff paid McCarty for the prescription at that time. (Doc. 17, Tab 1 at 77, 81; Doc. 21 ¶ 10.) Plaintiff informed Brannan and Rhodes she had told Scott, the supervisor over valet parking, about McCarty's conduct (picking up her prescription without her permission) that morning. (Doc. 17, Tab 1 at 77; Tab 2 at 22 and Ex. 1; Doc. 21 ¶¶ 11, 13.)

Plaintiff also told them that she had taken Lortab approximately two years ago. (Doc. 17, Tab 2 at 22, 46-47 and Ex. 1.) She stated that she had dropped a prescription off at the Kirklin Clinic pharmacy for Lortab the same morning McCarty approached her – September 27, 2001. (Doc. 17, Tab 1 at 94-95; Tab 2 at 46; Doc. 21 ¶¶ 7, 13.) According to plaintiff, upon arriving at work she asked Dr. Ransom if he could write her a prescription for Lortab because her ankle injury hurt and her Lortab prescription was out-dated. (Doc. 17, Tab 1 at 93-94; Doc. 21 ¶¶6-7.)

---

[5] Rhodes does not recall showing plaintiff the videotape. (Doc. 17, Tab 4 at 31.) Brannan recalled that Rhodes showed plaintiff the videotape, but cannot recall what Rhodes told her regarding the tape. (Doc. 17, Tab 2 at 16.)

Although he had not seen her as a patient, Dr. Ransom wrote a new prescription for plaintiff. (Doc. 17, Tab 1 at 94; Tab 4 at 22-23.)

### 3. Rhodes's follow up on the information provided by Plaintiff

After the interview with plaintiff, Rhodes telephoned McCarty to follow up on plaintiff's story about the anti-inflammatory prescription. (Doc. 17, Tab 4 at 41-43.) McCarty told Rhodes he had picked up the prescription from the pharmacy for plaintiff, but he indicated the prescription pick up was separate from the Lortab transaction. (Doc. 17, Tab 2 at 21-22 and Ex. 1; Tab 4 at 20-23, 28, 41-42.) The Kirklin Clinic pharmacy confirmed to Rhodes that plaintiff had an anti-inflammatory prescription filled the week before Robinson observed the transaction between plaintiff and McCarty. (Doc. 17, Tab 4 at 21-25.) Rhodes also spoke to Dr. Ransom regarding the Lortab prescription. (*Id.* at 22.) Dr. Ransom confirmed that plaintiff had an old Lortab prescription, which she asked him to refill. (*Id.* at 22-23; *see also* Doc. 21 ¶ 7.) That evening, Rhodes called plaintiff at home and placed her on administrative leave without pay. (Doc. 17, Tab 1 at 98, 105, 114 and Ex. 6.)

### 4. The Remaining Interviews

On October 2, 2001 Brannan and Rhodes interviewed Yavis Dozier, Brenda Comer, and Yolanda Warren, all African-Americans. (Doc. 17, Tab 2 at 23-24 and Ex. 1; Tab 3 at 14; Tab 4 at 11-12, 17-18; Tab 6 ¶ 6 and Ex. B.)

Dozier did not admit or deny that she told Robinson that a transaction was going to take place. (Doc. 17, Tab 2 at 32-34.) During the interview, Dozier told Brannan and Rhodes that the only person who mentioned McCarty or plaintiff to her was Rosalyn Green, also an African-American. (*Id.* at 34.) Dozier explained to them that Green told her to tell McCarty to come to

valet. (*Id.* at 32-34.)  Next they interviewed Comer, who did not have any additional information or know anything about the transaction between plaintiff and McCarty. (*Id.* at 22, 36-37 and Ex. 1.)

Brannan and Rhodes also interviewed Yolanda Warren. (*Id.* at 37 and Ex. 1.)  She informed them that she had given McCarty four Lortab. (*Id.*)  McCarty did not admit receiving any Lortab from Warren. (*Id.* at 22, 38-39 and Ex. 1.)

Rhodes and Brannan reported the information they gathered during the investigation to Thomas. (Doc. 17, Tab 4 at 34; Tab 5 at 14.)  They did not give any opinion to Thomas about whether they believed plaintiff or McCarty was being truthful. (Doc. 17, Tab 2 at 40; Tab 4 at 33-34.)

Thomas reviewed the information gathered during the investigation and the security report of Robinson. (Doc. 17, Tab 4, Ex. 1; Tab 5 at 14-15, 20-21.)  She also spoke to Harper and Scott about plaintiff. (Doc. 17, Tab 5 at 18-20.)  They did not have any knowledge about plaintiff giving McCarty prescription drugs. (*Id.*)  After considering all of the information before her, Thomas determined plaintiff had given McCarty Lortab. (*Id.* at 13-16.)  She based her determination on the observations of the security guards, McCarty's admission that plaintiff gave him drugs, as well as plaintiff's initial denial of having a Lortab prescription and then admitting Dr. Ransom had refilled a prescription for her that very morning. (*Id.* at 13-16.)  Thomas concluded plaintiff was not being honest about what happened, that plaintiff had distributed narcotics to her co-worker in violation of the Foundation's policy, and that termination would be appropriate. (*Id.* at 13-16; Tab 7 ¶ 5.)  Plaintiff received a certified letter dated October 4, 2001, informing her that "after careful consideration of the facts obtained" in the internal investigation, the Foundation had decided to terminate her employment. (Doc. 17, Tab 1 at 114-115 and Ex. 6.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met her burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. ANALYSIS

#### A. Plaintiff's Title VII and 42 U.S.C. § 1981 Disparate Treatment Claims

Plaintiff alleges that defendant discriminated against her on the basis of her race in violation of Title VII and 42 U.S.C. § 1981. When plaintiff offers no direct discriminatory evidence, she must use circumstantial evidence to prove her case. The law governing disparate treatment cases involving circumstantial evidence is well settled.[6] First, plaintiff must establish a prima facie case of racial discrimination by showing: (1) that she belongs to a protected group, African-American, (2) that she experienced an adverse job action, (3) that her employer treated similarly situated persons who are not African-American more favorably, and (4) that she was qualified for her position. *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999); *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1310, *opinion modified by*, 151 F.3d 1321 (11th Cir. 1998). *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Another way plaintiff may establish a prima facie case is to show that defendant replaced her with someone outside of the protected class. *See Hinson v. Clinch County Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000).

If plaintiff successfully establishes a prima facie case, defendant must then articulate a legitimate, nondiscriminatory reason for its termination of plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). After defendant articulates a legitimate, nondiscriminatory reason, plaintiff must come forward with evidence that the proffered reason is a pretext for race discrimination. *Id.* at 804. If plaintiff establishes pretext, she remains obligated to demonstrate a discriminatory motive. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

---

[6] The standard for establishing discrimination under Title VII and 42 U.S.C. § 1981 is the same. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

### 1. Prima facie case

One way for plaintiff to establish a prima facie case of discrimination would be to show that plaintiff belongs to a protected group, experienced an adverse employment action, and was replaced by someone outside her protected group. *See Maynard v. Board of Regents of Div. Of Universities . . .*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997). Although plaintiff belongs to a protected group and experienced an adverse employment action, there is no evidence that after plaintiff was terminated defendant replaced her with someone outside the protected class. After plaintiff's termination, defendant hired Harold Foster, who is African-American, to replace plaintiff. (Doc. 17, Tab 7 ¶ 9.)

In addition, plaintiff has offered no evidence showing the defendant treated her less favorably than any similarly situated white employee. "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998), *opinion modified by* 151 F.3d 1321 (11th Cir. 1998), citing *Holifield v. Reno*, 115 F.3d at 1562.

Plaintiff argues the defendant treated McCarty more favorably because McCarty resigned his employment and plaintiff was terminated. (Pl.'s Br. at 8.) McCarty and plaintiff arguably committed the same policy violation–she distributed narcotics, and he received the distribution. However, the difference between McCarty and plaintiff does not involve how they were treated by the defendant, but how they reacted when confronted with the evidence. Unlike plaintiff, when confronted with the allegations against him, McCarty resigned. (Doc. 17, Tab 2 at 25-27.) The defendant did not have the opportunity to terminate his employment, but would have if he had not resigned at the conclusion of his interview with Brannan and Rhodes. (Doc. 17, Tab 7 ¶

4, 8; Tab 2 at 25-27.) *See Snoke v. Staff Leasing, Inc.*, 43 F. Supp. 2d 1317, 1324 (M.D. Fla. 1998) (finding plaintiff who was terminated because of rumors that she was having an affair with a manager was not treated less favorably than the manager who chose to voluntarily resign). Plaintiff never indicated she had any desire to resign her employment, nor did she submit a resignation. (Doc. 17, Tab 6 ¶ 5; Tab 7 ¶ 7.) Also, the defendant did not offer McCarty any opportunity that it denied plaintiff–McCarty simply tendered his resignation. (Doc. 17, Tab 2 at 25-27; Tab 7 ¶¶ 4, 8.) The end result for McCarty and plaintiff is the same: as a result of the investigation neither is employed by defendant and neither is eligible for rehire. (Doc. 17, Tab 7 ¶ 8).

Because plaintiff was not replaced by someone outside of her protected class and did not identify any similarly situated white employee who received more favorable treatment, she has not established a prima facie case of race discrimination.

2.  **Pretext**

Assuming a prima facie case of race discrimination, plaintiff has not offered sufficient evidence on which a reasonable jury could find defendant's legitimate, nondiscriminatory reasons for discharging plaintiff, that is, that it terminated plaintiff (1) because she distributed Lortab to a coworker on its premises, and (2) because she was not completely honest about the situation, were pretext for unlawful race termination. Plaintiff argues that defendant's reasons are pretextual because (1) the investigators "presumed" plaintiff was guilty "even though the evidence proved her innocence," (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 13); (2) plaintiff did not deny having a prescription for Lortab, rather she claimed the prescription was unfilled; and (3) Brannan and Rhodes lied to her during the investigation when they told her they had the transaction on videotape.

Plaintiff argues that defendant's reasons for plaintiff's termination are pretext for unlawful discrimination because defendant "presumed" plaintiff was guilty. Plaintiff further argues that "the presumption of guilt was a product of racial profiling and stereotyping." *Id.* The facts before the defendant at the time the decision was made to terminate plaintiff were as follows: on September 25, 2001, a security guard, Robinson, heard plaintiff was looking for McCarty so she could sell him prescription pills. (Doc. 17, Tab 4 at 11-12, 31-32 and Ex. 1.) A little later Robinson and another security guard, Young, while watching the security monitor, saw plaintiff and McCarty engage in a "transaction." (*Id.*) Robinson reported the situation to Rhodes, who began an investigation. (Doc. 17, Tab 4 at 10-11, 15-16.) When questioned, McCarty admitted that plaintiff gave him some Lortab pills on the day in question. (Doc. 17, Tab 2 at 22-26.)

Plaintiff alleges a different version of events occurred. According to plaintiff, she met with McCarty and paid him for an anti-inflammatory prescription he picked up for her, without her authorization (Doc. 17, Tab 1 at 77-81), and she then reported McCarty's conduct to Scott (*Id.* at 77, 83-87). Thus, plaintiff's version of events is that Robinson and Young saw her paying McCarty for her Naproxen and misinterpreted it as plaintiff selling or giving McCarty Lortab. The fact that defendant chose to believe McCarty and not plaintiff does not establish pretext. Moreover, there is no evidence on which a reasonable jury could find defendant engaged in racial profiling. Plaintiff's "racial profiling" argument has no merit.

Plaintiff's second argument, that her Lortab prescription at the Kirklin Clinic was unfilled also fails to establish pretext. Whether or not plaintiff had the prescription filled at the Kirklin Clinic pharmacy is not relevant to whether she gave any Lortab pills to McCarty. There are any number of ways plaintiff could have obtained the Lortab pills McCarty says she gave him. Defendant's main concern was not where plaintiff received the drugs, but the fact she was

distributing them to coworkers, at work and during working hours. Accordingly, even if plaintiff's assertion is true, that her Lortab prescription at the Kirklin Clinic pharmacy was unfilled, it does not address the issue of whether she gave Lortab to McCarty.

Finally, plaintiff's third contention – that Brannan and Rhodes lied to her when they told her they had the incident on tape – does not establish pretext. Assuming Brannan and Rhodes showed plaintiff the videotape and implied they had the incident on tape, it does not demonstrate pretext. McCarty had already admitted plaintiff gave him Lortab, and two African-American security guards witnessed a "transaction" between plaintiff and McCarty. Based on the evidence obtained during the investigation, defendant found that plaintiff gave McCarty Lortab.

However, even if defendant mistakenly believed plaintiff distributed prescription medication to McCarty, it does not show that defendant's decision was motivated by race. *See Alexander v. Fulton County,* 207 F.3d 1303, 1339 (11th Cir. 2000) ("A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race."); *Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir.1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action")(internal marks and citations omitted). Therefore, even if plaintiff "did not in fact commit the violation with which [s]he is charged, [defendant] successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed [plaintiff] committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

There is no evidence before the court on which a reasonable jury could find that Thomas, who made the decision to terminate plaintiff, did not honestly believe that plaintiff distributed Lortab pills to McCarty. (Doc. 17, Tab 5 at 13-16; Tab 7 ¶ 5.) "[F]ederal courts do not sit to second-guess the business judgment of employers. Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom

of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997). Defendant is entitled to judgment as a matter of law on plaintiff's Title VII and 42 U.S.C. § 1981 claims.

### B. Plaintiff's Mixed Motive Argument

At oral argument, plaintiff contended that based on the Supreme Court decision of *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148 (2003), summary judgment is improper. In *Desert Palace* the Supreme Court held that direct evidence of discrimination is not required for a plaintiff to obtain a mixed motive jury instruction. 123 S. Ct. at 2153-55. This is not a mixed motive case. Therefore, *Desert Palace* does not apply.

### IV. CONCLUSION

For the reasons stated herein, the court finds defendant's Motion for Summary Judgment is due to be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this the 12th day of August, 2004.

*/s/ Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge